**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 8:03CV465 |
| | ) | |
| $124,700.00 IN UNITED STATES CURRENCY, | ) | MEMORANDUM |
| | ) | and |
| Defendant, | ) | ORDER |
| | ) | |
| MANUEL GOMEZ, ANDRES MADRIGAL MORGAN and EMILIANO GOMEZ GONZOLEZ, | ) | |
| | ) | |
| Claimants. | ) | |

This is an action pursuant to 21 U.S.C. § 881 for the forfeiture of $124,700.00 in United States currency seized from the Claimant, Emiliano Gomez Gonzolez (Gonzolez), on May 28, 2003. Pursuant to 28 U.S.C. § 636 and the consent of the parties,[1] the matter was tried to the undersigned magistrate judge on December 20-21, 2004, whereupon the case was deemed submitted for decision.

**FINDINGS OF FACT**

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355 and 1395, and pursuant to 21 U.S.C. § 881. The defendant property is $124,700.00 in United States Currency. The property was seized from Gonzolez on May 28, 2003, within the District of Nebraska and is presently in the District of Nebraska. Gonzolez has filed a claim of ownership, pertaining to $40,000.00 of the defendant property. Andres Madrigal Morgan (Morgan) has filed a claim of ownership, pertaining to $20,000.00 of the defendant property.

---

[1]On February 10, 2004, United States District Judge Joseph F. Bataillon transferred this matter to the undersigned magistrate judge. **See** Filing No. 19.

Manuel Gomez (Gomez) has filed a claim of ownership, pertaining to $64,700.00 of the defendant property.

On May 28, 2003, at approximately 9:15 a.m., Nebraska State Patrol (NSP) Trooper Chris Bigsby (Trooper Bigsby) stopped a Ford Taurus being driven westbound on I-80 by Gonzolez. Trooper Bigsby observed the vehicle traveling 70 miles per hour in a 65 miles per hour zone. Trooper Bigsby informed Gonzolez of the reason for the stop, asked for a driver's license and the vehicle registration. Trooper Bigsby also asked Gonzolez how fast he thought he had been driving. Gonzolez responded "paquito 67." Gonzolez produced a Nevada driver's license and a rental contract for the vehicle (Exhibit 4). The rental contract names Martin T. Cardenas as the renter and does not list Gonzolez as an additional driver.

Trooper Bigsby had Gonzolez sit in the patrol vehicle while Trooper Bigsby checked the vehicle's information and ran Gonzolez for driving status and criminal history. During the wait, Trooper Bigsby asked Gonzolez about his travels. Gonzolez stated he had been in Chicago for three days and that he drove a produce truck. Trooper Bigsby and Gonzolez were having some trouble understanding each other because Gonzolez spoke limited English. At one point, Trooper Bigsby drew a picture of an airplane and Gonzolez stated he did not like to fly.

Based on the criminal history search, Trooper Bigsby learned Gonzolez had been arrested in May 2003 for driving while intoxicated. Trooper Bigsby asked Gonzolez twice if Gonzolez had ever been arrested. Gonzolez said no.

Although Trooper Bigsby had not asked for back-up, Lincoln Police Department Officer Jason Brownell (Officer Brownell) arrived to see if Trooper Bigsby needed any assistance. Officer Brownell approached the passenger side of the patrol vehicle and spoke to Gonzolez and Trooper Bigsby through the window. Officer Brownell was able to speak more Spanish than Trooper Bigsby. Trooper Bigsby asked Officer Brownell to ask Gonzolez, in Spanish, if he (Gonzolez) had ever been arrested. Again, Gonzolez said no.

Trooper Bigsby returned all of the paperwork to Gonzolez, including a written warning for speeding, then asked if the officers could ask more questions. Gonzolez agreed. The officers asked if Gonzolez had any contraband, including specific drugs, in the vehicle.

Gonzolez said no and "none." Officer Brownell also asked Gonzolez if he had a large sum of cash in the vehicle. Gonzolez said no.

Officer Brownell requested permission to search the vehicle, in Spanish. Gonzolez gave consent to search. Trooper Bigsby began the search with a food cooler he had seen on the back seat of the vehicle (Exhibit 5I). Trooper Bigsby found a bundle of United States Currency in the cooler, but found nothing else of evidentiary value. The currency was stored in 20 rubber banded bundles, contained in seven aluminum foil wrapped bundles all in a large plastic bag at the bottom of the cooler (Exhibits 5A-5C). The currency was comprised of 140 $100 bills, 999 $50 bills, 2,932 $20 bills, 208 $10 bills and six $5 bills, for a total of $124,700.

After discovery of the currency, Gonzolez and the vehicle were taken to the NSP traffic office in Lincoln. At the traffic office, NSP Trooper Sean Caradori (Trooper Caradori) and his police canine, Rico, conducted an exterior sniff of the Ford Taurus. Rico alerted to the odor of narcotics at the rear passenger side of the vehicle where the cooler was located. No narcotics were found in the vehicle. Trooper Caradori then used Rico to conduct a discretionary search of the currency. First, Trooper Caradori deployed Rico in a utility room at the traffic office. Rico did not indicate the odor of narcotics in the room. Next, a trooper collected $92 U.S. Currency in seven bills from other troopers and put the currency in a brown envelope. A trooper hid the troopers' currency and the subject currency in the utility room. Finally, Trooper Caradori deployed Rico in the room. Rico alerted to the odor of narcotics on the subject currency, but did not alert on the troopers' currency.

NSP Investigator Luis Herrera, who is fluent in the Spanish language, administered a *Miranda* warning and interviewed Gonzolez at the traffic office. During the interview, Gonzolez explained the Ford Taurus had been rented by a friend of a friend. Gonzolez had flown to Chicago one-way with a ticket he paid for with cash. Gonzolez had intended to purchase a Freightliner refrigerated truck, but he did not know the name or address of the person who was going to sell the truck. Gonzolez stated he had made several trips to Chicago over time in order to transport the cash, of which $40,000 was his savings. Finally, Gonzolez told Investigator Herrera that he (Gonzolez) had been driving in excess of the posted speed limit

when he had been stopped. Gonzolez was not charged with any crime and was released the same day.

During the trial, Gonzolez explained he went to Chicago to buy a refrigerated truck for a produce business. Gonzolez pooled his money with Gomez and Morgan. Gonzolez flew to Chicago with all of the currency in a backpack with his clothes. Gonzolez's friend in Chicago warned him that it was not a good idea to travel with over $10,000 in cash and that carrying such amounts might get him into trouble. After Gonzolez learned the refrigerated truck he planned to buy for $120,000 had already been sold, he decided to drive back to San Diego. Gonzolez was unable to rent a vehicle himself because he did not have a credit card and he did not go with his friend to rent the Ford Taurus. Gonzolez explained that he wrapped the currency up in the manner found in the cooler because he was concerned about being robbed, not because he was trying to hide it from law enforcement. Gonzolez has not had a bank account in many years. Gonzolez had been saving the money at his home or a family home over the years.

Gonzolez testified he could not understand Trooper Bigsby and could understand Officer Brownell only a little. Gonzolez explained he became scared when the officers asked him about having currency in the vehicle because of what his friend in Chicago had told him. Gonzolez explained when the officers asked him about past "crimes" he did not think to tell them about the DUI arrest because he had not been convicted or placed in jail after that arrest. Gonzolez understood Investigator Herrera. Gonzolez stated he was truthful to Investigator Herrera, but still tried to protect his friends by not giving their correct last names.

Gomez also testified at trial. Gomez explained he had been delivering produce in California for his father-in-law. Gomez then opened his own produce store and always uses cash in his business transactions. Gomez saved his money in a box in his house over the years. Gomez decided to purchase a refrigerated truck because it would be cheaper than renting trucks to deliver the produce. Gomez contacted Gonzolez, who was a professional truck driver, to see if Gonzolez wanted to be his partner and drive the truck. Gomez learned they could buy a truck in Chicago for $120,000, plus $5,000 for a tip to Gonzolez's friend.

## CONCLUSIONS OF LAW

### A.  Constitutionality of Search

Gonzolez argues his initial stop, his detention, the search of the vehicle and his statements were conducted in an unconstitutional manner and all evidence derived therefrom should be suppressed.  Gonzolez has standing to contest the search of the Ford Taurus although he was not listed on the rental contract.[2]  The passenger in a vehicle may challenge the legality of a stop and argue suppression of evidence as the fruit of illegal activity.  ***United States v. Lyton***, 161 F.3d 1168, 1170 (8th Cir. 1998).

#### 1.  Traffic Stop

The Eighth Circuit has "repeatedly held that any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." ***United States v. Mallari***, 334 F.3d 765, 766 (8th Cir. 2003) (internal quotation and citations omitted).  "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." ***United States v. Jones***, 275 F.3d 673, 680 (8th Cir. 2001).  An officer has an objectively reasonable basis for stopping a motorist where the officer has a reasonable basis for believing that the driver has breached a traffic law. ***Mallari***, 334 F.3d at 766 (**citing *United States v. Thomas***, 93 F.3d 479, 485 (8th Cir. 1996) and ***United States v. Sanders***, 196 F.3d 910, 913 (8th Cir. 1999) (officer's mistaken, but objectively reasonable belief that a traffic violation occurred supported traffic stop)).

In this case, Trooper Bigsby observed Gonzolez driving the Ford Taurus in excess of the posted speed limit.  A fact which Gonzolez later admitted.  Although, the evidence shows the speed was at most five miles over the limit, driving in excess of the posted speed limit is a traffic violation.  **See** Neb. Rev. Stat. § 60-6,186.  Accordingly, Trooper Bigsby had an objectively reasonable basis for stopping the Ford Taurus.

---

[2]Initially, the government had contested whether either Morgan or Gomez had standing to contest the forfeiture because they were not in possession of the currency at the time of its seizure, however the government withdrew such argument.  **See** Filing No. 40, p. 8 (Trial Brief).

5

**2.      Detention**

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and the issuing of a citation. ***United States v. $404,905.00,*** 182 F.3d 643, 647 (8th Cir. 1999); **see also** ***United States v. Sokolow***, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle. ***$404,905.00,*** 182 F.3d at 647; ***United States v. Allegree,*** 175 F.3d 648, 650 (8th Cir. 1999). The police officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made by the police officer regarding illegal drug use, and divergent information from the passengers. ***$404,905.00,*** 182 F.3d at 647; ***Allegree,*** 175 F.3d at 650-51. The Court finds the information and unusual circumstances surrounding the Gonzolez's travel plans learned by the officers and confusion about whether Gonzolez had previously been arrested justified the minimal detention necessary, if any detention occurred after the end of the valid traffic stop, to obtain consent to search.

**3.      Consent to Search**

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; **see** ***United States v. Ameling***, 328 F.3d 443, 447 (8th Cir.), **cert. denied**, 124 S. Ct. 422 (2003) (Fourth Amendment applies to the states through the Fourteenth Amendment). A search, "in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less." ***Chimel v. California***, 395 U.S. 752, 763 (1969). The warrantless search of a vehicle may be constitutional pursuant to a number of exceptions to the warrant requirement including as a search incident to arrest (***New York v. Belton***, 453 U.S. 454, 460 (1981)) and consent to search (***United States v. Welerford***, 356 F.3d 932 (8th Cir. 2004)). The government has the burden of proving that an exception to the warrant

requirement applies. **United States. v. Bruton**, 647 F.2d 818, 829 (8th Cir. 1981); **see United States v. James**, 353 F.3d 606, 613 (8th Cir. 2003).

The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances." **Ohio v. Robinette,** 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his **Miranda** rights, and whether an individual had experienced prior arrests. **United States v. Welerford**, 356 F.3d 932, 936 (8th Cir. 2004). A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred. **Id.**

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." **Bumper v. North Carolina**, 391 U.S. 543, 548-49 (1968) (footnotes omitted). "The government bears the burden of proving voluntary consent [to search] by a preponderance of evidence." **United States v. Galvan-Muro**, 141 F.3d 904, 907 (8th Cir. 1998).

In this case, Gonzolez was not placed in handcuffs or threatened. Only two officers were present during the questioning, one of which was helping to translate. After Trooper Bigsby issued the traffic warning, the officers immediately obtained consent to ask more questions and asked for consent to search. Although Gonzolez indicated he had difficulty understanding the officers, he responded appropriately to questions and appeared to understand the questions and be cooperative. Based on these factors, the Court finds Gonzolez's consent to search was knowingly and voluntarily given. Once the officers located

the currency, which Gonzolez previously denied having, the officers had additional justification to further detain Gonzolez and the vehicle.

### 4. Statements

The touchstone for the admissibility of a suspect's statements is voluntariness. **Brown v. Mississippi**, 297 U.S. 278, 279 (1936). A court must look to the totality of circumstances in determining whether or not the statements were voluntary. **Mincey v. Arizona**, 437 U.S. 385, 401 (1978); **Colorado v. Connelly**, 479 U.S. 157 (1986); **Schneckloth v. Bustamonte**, 412 U.S. 218 (1973). In this case, Gonzolez was advised, in Spanish, of his constitutional rights pursuant to **Miranda v. Arizona**, 384 U.S. 436 (1966). There is no evidence Gonzolez did not understand the advice of rights. Gonzolez stipulated during trial that he was properly **Mirandized** before Investigator Herrera interviewed him.

Even though Gonzolez was advised of his **Miranda** rights, the Court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity. Coercive police conduct will render a confession inadmissible. **Blackburn v. Alabama**, 361 U.S. 199 (1960). In determining whether a defendant made statements voluntarily, a court must determine if the accused was coerced or his will was overborne and his capacity for self-determination critically impaired. **United States v. Santos-Garcia**, 313 F.3d 1073, 1079 (8th Cir. 2002). A court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. **Schneckloth**, 412 U.S. at 225-26. Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights. **Connelly**, 479 U.S. at 167. However, any police questioning has coercive aspects to it simply by reason of the confrontation. **See Santos-Garcia**, 313 F.3d at 1079 ("To state the obvious, 'interrogation of a suspect will involve some pressure because its purpose is to elicit a confession.'"). The police officer is part of the law enforcement system that will cause a charge to be made against a suspect. The questioning by a police officer, while uncomfortable, is not coercive *per se*. **See Oregon v. Mathiason**, 429 U.S. 492, 495 (1977).

Here, the interview was relatively brief. There is no evidence to suggest Gonzolez was intimidated or coerced during the interview. The Court finds Gonzolez's will was not overborne and he made statements to the officers voluntarily. Additionally, the Court has already found Gonzolez was not subject to an illegal stop or detention, therefore statements asserted to be suppressed as the fruit of illegal police conduct should not be suppressed under ***Wong Sun v. United States***, 371 U.S. 471 (1963).

Based on the above findings, the Court concludes the stop, detention, search and questioning related to this matter were constitutional. Accordingly, the evidence gathered on May 28, 2003, may be used against Gonzolez for any reason.

### B.   Property's Connection to Criminal Offense

The Civil Asset Forfeiture Reform Act of 2000, § 2(a), Pub. L. No. 106 185, 114 Stat. 202, 205 (codified at 18 U.S.C. § 983(c)(1)) ("CAFRA") allows the United States government to seize any property "used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense." 18 U.S.C. § 983(c)(3). In this case, the government alleges that the currency recovered from the Ford Taurus was used to commit or facilitate the commission of a criminal offense, i.e., drug trafficking. Under CAFRA, the burden of proof is on the government to establish, by a preponderance of the evidence, that there was a substantial connection between the currency and the offense of drug trafficking. **See** 18 U.S.C. § 983(c)(1) & (3)[3]; **see also *United States v. $84,615.00 in U.S. Currency***, 379 F.3d 496, 501 (8th Cir. 2004). "[T]he government does not have to show evidence of, or trace the money to, a particular transaction." ***United States v. U.S. Currency in the Amount of $150,660.00***, 980 F.2d 1200, 1205 (8th Cir. 1992) (citations omitted). "Circumstantial evidence can be used by the United States to establish its burden of proof." ***$84,615.00 in U.S. Currency***, 379 F.3d at 501.

---

[3]CAFRA applies to forfeiture proceedings commenced after August 23, 2000. 18 U.S.C. § 983, historical and statutory notes (2000). "The law prior to CAFRA allowed the government to seize property on a mere showing of probable cause and then placed the burden of proof on the claimant to show by a preponderance of the evidence that the property was not subject to forfeiture." ***United States v. Parcel of Property***, 337 F.3d 225, 227 (2d Cir. 2003).

The currency was seized pursuant to 21 U.S.C. § 881.[4]  "Section 881(a)(6) is a weapon in the war on drugs."  ***$84,615.00 in U.S. Currency***, 379 F.3d at 501 (citation omitted).  Pursuant to 21 U.S.C. § 881(a)(6), all money furnished or intended to be furnished in exchange for illegal drugs, all drug proceeds, and all money used or intended to be used to facilitate illegal drug trafficking is subject to civil forfeiture.  ***United States v. Thirty-Nine Thousand Eight Hundred Seventy-Three and No/100 Dollars ($39,873.00)***, 80 F.3d 317, 318 (8th Cir. 1996).

At trial, the government presented only circumstantial evidence to establish a connection between the subject currency and drug trafficking. The first category of evidence consists of the bulk of the subject currency bound in rubber banded stacks.  "Courts have recognized that, for purposes of a civil forfeiture action, the possession of a large sum of currency is strong evidence of narcotics trafficking."  ***United States v. $22,991.00, more or less, in U.S. Currency***, 227 F. Supp. 2d 1220, 1232 (S.D. Ala. 2002) (citing cases) (forfeiture based upon seven factors including a large amount of currency was found in close proximity to narcotics); **see** ***$84,615.00 in U.S. Currency***, 379 F.3d at 501 (noting large sums of currency is evidence of connection to drug activity, where the claimant admittedly possessed marijuana on his person and clothes, admitted he was a drug user, had an unusually large amount of cash that had been carefully concealed in seven vacuum-sealed bags, and that a drug dog alerted to the seized currency); ***United States v. Blackman***, 904 F.2d 1250, 1257 (8th Cir. 1990) ("large sums of unexplained currency," in connection with other evidence of drug trading, is "circumstantial evidence" of the intent to distribute cocaine).  **Compare** ***United States v. $121,100.00 in U.S. Currency***, 999 F.2d 1503, 1507 (11th Cir.

---

[4] Section 881(a)(6) provides for the forfeiture of:
> [a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

21 U.S.C. § 881(a)(6).

1993) (using former probable cause standard in holding "[a]lthough insufficient by itself to demonstrate a connection to illegal drugs, the quantity of cash seized [may be] highly probative of a connection to some illegal activity.")  Furthermore, "money seized from residence was wrapped in rubber bands, which . . . is characteristic of the way drug money is stored." **United States v. $12,380.00**, 956 F.2d 801, 806 (8th Cir. 1992) (forfeiture based on probable cause standard and included evidence of drug trafficking transactions at residence).  In this case, the bulk of the currency discovered in the cooler was wrapped in rubber bands inside foil packing and a plastic bag, in the bottom of a food cooler.

The second category of evidence was the fact a police canine alerted to the odor of narcotics on the currency.  A police canine's alert to currency provides some-albeit slight-indication that the money is connected to drug trafficking. **United States v. $84,615.00 in U.S. Currency**, 379 F.3d 496, 502 (8th Cir. 2004) (relying on circumstantial evidence that the claimant "admittedly possessed marijuana on his person and clothes, that he admitted that he was a drug user, that he had an unusually large amount of cash that had been carefully concealed in seven vacuum-sealed bags, and that a drug dog alerted to the seized currency"); **United States v. $141,770.00 in U.S. Currency**, 157 F.3d 600, 604 (8th Cir. 1998) (concluding police canine's alert to the seized money supported the government's contention that the currency was substantially connected to illegal drugs along with admissions of the claimant); **cf. Illinois v. Caballes**, 125 S. Ct. 834, 839 (2005) (noting "pervasive contamination of currency by cocaine") (dissent) (**citing United States v. $242,484.00**, 351 F.3d 499, 511 (11th Cir. 2003) (noting that because as much as 80% of all currency in circulation contains drug residue, a dog alert "is of little value"), **vacated on other grounds by rehearing en banc**, 357 F.3d 1225 (2004)).  Here, Rico alerted to the Ford Taurus on the side where the food cooler contained the currency.  Additionally, Rico alerted to the currency when it was hidden in the NSP utility room, although Rico did not alert to a random assortment of seven bills gathered from troopers.

The third category of evidence is the route and circumstances of Gonzolez's travel. **See United States v. $121,100.00 in U.S. Currency**, 999 F.2d 1503, 1507 (11th Cir. 1993) ("The manner in which [the claimant] purchased his airline ticket and the nature of his travel itinerary

11

cast doubt on the possibility that he was travelling on either business or vacation."); **see also** *United States v. Sokolow*, 490 U.S. 1, 8 (1989) ("Paying $2,100 in cash for two airplane tickets is out of the ordinary."). Gonzolez traveled one-way by airplane from California to Chicago, where he stayed for only three days. Gonzolez purchased his ticket with cash. Gonzolez then traveled by rental car, which car was not in his name, back toward California with a substantial amount of U.S. currency in small bills.

The Eighth Circuit has previously held travel from California to Illinois and back to California, that is between a drug source and drug destination state, to be evidence supporting civil forfeiture. *$141,770.00 in U.S. Currency*, 157 F.3d at 602, 604 (using probable cause standard). In *$141,770.00 in U.S. Currency*, the court also relied on the amount of currency and a police canine's alert to the currency and the vehicle. The *$141,770.00 in U.S. Currency* court stated, "Most important, however, is the telltale packaging in which the seized currency was found." *Id.* at 604. The currency was concealed in a secret ceiling compartment of a camper, wrapped in scented fabric softener sheets and sealed in three layers of zip-lock bags. *Id.* The court stated, "[t]he wide-spread use of scented dryer sheets to mask the smell of illegal narcotics is well documented in the decisions of the Courts of Appeals." *Id.* n.4 (citing cases). Additionally, although the claimant first denied knowledge of the currency, he later admitted to having wrapped the currency in dryer sheets in an attempt to mask any odor from police canines, as he had seen done in television reports. *Id.* The instant case is distinguishable from *$141,770.00 in U.S. Currency* because here there are no statements by the claimants which are incompatible with the evidence or which cast undue suspicion on the manner in which the currency was wrapped.

The statements made by the claimants concerning the currency are unusual given the convenience of conventional banking for many. However, the use of currency, rather than other forms of payment for business, does not provide a "substantial connection" to between this currency and drug trafficking. Although, the sum of currency was large, the claimants gave a plausible and consistent explanation for its origin and intended use. **Cf.** *$84,615.00 in U.S. Currency*, 379 F.3d at 502 (claimants behavior during police contact undermined the credibility of his assertions of legitimate reasons for possessing the money). Additionally, the

12

manner in which the currency was bundled is unusual. However, the bundling is consistent with an attempt to sort the currency by contributor and conceal the currency from would-be thieves, rather than only to hide it from law enforcement and police canines. *Cf. $141,770.00 in U.S. Currency*, 157 F.3d at 602 (claimant initially denied knowledge of currency, then admitted wrapped to avoid detection by police canine). No expert witness testified about whether the manner the bundles were wrapped either increased or decreased the likelihood of the currency's use or connection with a drug trafficking offense. Further, Gonzolez did lie to law enforcement regarding the names of his friends and other minor details, which may have appeared suspicious during questioning, but do not provide a substantial connection between the currency in this matter and drug trafficking. Finally, the only criminal history associated with any of the three claimants is Gonzolez's single DUI arrest.

There is no evidence of any narcotics or other contraband found in the Ford Taurus or otherwise connected with the currency. *Cf. $84,615.00 in U.S. Currency*, 379 F.3d at 501. Gonzolez made no admissions of guilt. *Cf. id.* The Court concludes evidence showing only the existence of a large sum of currency, wrapped in an unusual manner and containing an odor of narcotics, coupled with Gonzolez's unusual travel itinerary fails to demonstrate a substantial connection between the defendant property and drug trafficking. Based on this conclusion, the Court need not determine whether the claimants established they are innocent owners of the currency pursuant to 21 U.S.C. § 881(a)(6). Upon consideration,

**IT IS ORDERED**:

1. The Court concludes the defendant currency should not be forfeited to the United States and judgment should be entered in favor of the claimants and against the government.

2. A separate judgment will be entered contemporaneously with this Memorandum and Order.

DATED this 22nd day of June, 2005.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge